FÉLIX BENÍTEZ REXACH, Plaintiff and Appellee, *v.* R. SANCHO BONET, TREASURER OF PUERTO RICO, Defendant and Appellant.

No. 7558. Argued May 12, 1938.—Decided May 11, 1939.

*B. Fernández García, Attorney General,* and *E. Campos del Toro, Assistant Attorney General,* for appellant. *Miguel Guerra-Mondragón* for appellee.

MR. CHIEF JUSTICE DEL TORO delivered the opinion of the Court.

Félix Benítez Rexach filed a petition for injunction against the Treasurer of Puerto Rico, Rafael Sancho Bonet, substantially on the following grounds:

That he was on all the dates mentioned in the complaint and when it was filed, the owner of an "establishment or resort known as the Escambrón Beach Club, situated in the Escambrón Federal Military Reserve, in the city of San Juan," over which the Government of the United States "exercises exclusive jurisdiction for all purposes."

That the defendant, under color of authority, has assessed the real and personal property that the plaintiff owns in said Reserve and has imposed a tax upon it of $5,291.97 which he pretends to collect summarily, in case payment thereof is defaulted, for which purpose he (the defendant) attached on June 25, 1936, the following property of plaintiff: two buildings, two bath houses, one house, three walks, one bridge, one ice plant, a small house or platform for the band, all situated in said reserve, which is an integral part of said Escambrón Beach Club;

That the assessment, the levy of the tax, and the said attachment are illegal, the Treasurer having arbitrarily overstepped the bounds of his authority; that should such collection be effected, the plaintiff would suffer irreparable damage because he would be subjected to a multiplicity of suits in

order to recover said taxes that he would be bound to pay under protest, and that he has no speedy, adequate and efficient remedy at law.

While the suit was pending, he moved for a preliminary writ of injunction. The court ordered the defendant to appear to show cause, if any, why the writ prayed for should not be granted and issued a restraining order requiring a $500 bond therefor. The defendant answered the restraining order and the petition for a preliminary writ, and on September 3, 1936, moved the court to annul the restraining order and to dismiss the latter because the grounds alleged in the petition were not clear and established a controversy of title, because it tended to restrain the collection of a tax, because the resulting damages would not be irreparable nor would there result a multiplicity of suits, because plaintiff did not come with clean hands, and because he had an adequate remedy at law.

As an affimative defense and opposition to the facts alleged, he maintained that the People of Puerto Rico were the owners of the land where the Escambrón Beach Club is situated which lands were acquired by virtue of a contract entered into by the People of the United States of America and the People of Puerto Rico, whereby the former conveyed to the latter, in exchange for other properties, the lands in question which were presently in possession of the People of Puerto Rico, pending only the making of the corresponding documents to transfer the title; that the petitioner did enter and is enjoying the possession of said lands under a contract of lease entered into on December 18, 1931, with the People of Puerto Rico, whereby he is estopped from denying the terms of said contract and the title of the lessor, and that by virtue of what has been stated it appears that the tax was assessed and the attachment levied according to law.

Seven days later the parties came into court and the plaintiff offered the following evidence:

A lease entered into on December 15, 1931, by the People of Puerto Rico represented by Guillermo Esteves, Commissioner of the Interior, and Félix Benítez Rexach, an engineer, and a resident of San Juan. It reads thus in its pertinent part literally transcribed:

"CONTRACT of lease of certain real property owned by the People of Puerto Rico, subject to the following clauses and conditions:

"1.— . . . situated close to the place known as the Escambrón, it being part of the land owned by the Insular Government to be dedicated to the construction of the Muñoz Rivera Park, having an *area of ten thousand seven hundred* (10,700) square meters, as it appears topographically described in the map. . . .

"2.— . . . it shall be dedicated and used as a place for recreation and a beach in connection with the bathing resort to be constructed, and there shall be erected on said land all the buildings and structures necessary. . . .

"3.— . . . the rent shall be *one thousand two hundred* ($1,200) *dollars* annually. . . .

"4.—The duration of the contract shall be *fifteen years* (15) and the term shall begin to run one year after this contract is signed, and the lessee, Félix Benítez Rexach, agrees to invest in said construction an amount of not less than *thirty thousand* (30,000) *dollars;* and it is further agreed between the parties that for every *two thousand* (2,000) *dollars* that Benítez Rexach should therein invest over the amount stipulated he will be entitled to extent the lease for one more year, but it shall be understood that the term shall (not) exceed *thirty* (30) *years,* regardless of the additional amount invested.

. . . . . . . . . . .

"6.—Upon the termination of this contract all the buildings therein constructed and all additional means of exploitation shall inure to the benefit of the Muñoz Rivera Park, except those of a permanent nature which shall become the property of the Government by paying for them to the lessor, after an appraisal thereof is effected by experts appointed by both parties.

. . . . . . . . . .

"15,—This contract is subject to the eventuality of the conveyance by the Government of the United States to the People of Puerto Rico, of the lands constituting the Reserve of the Escambrón."

Witness Lucas Jiménez, Collector of Internal Revenue of San Juan. He was shown the notice of attachment and acknowledged that it was signed by him. The document was admitted without objection. The property attached is thus described:

"Urban property, located in Puerta de Tierra, Escambrón, of the municipality of Puerto Rico, with an area of lot of the Federal Government, with 2 buildings, 2 bath houses, one house, 3 walks, one bridge, one ice plant, one small house or platform for the band, all new. On the North_____, on the South_____, on the East the Federal Government, on the West_____."

Upon questions by defendant he testified that no land belonging to the Federal Government had been attached.

Memorandum submitted by the Assistant Treasurer of Puerto Rico on November 12, 1935; letter written by defendant to petitioner on November 21, 1935, and Bill No. 2394 presented in the House of Representatives of the United States on April 11, 1935, entitled, "An Act to authorize the conveyance of certain military reserves to other departments of the Government, and for other purposes", where on page 3, lines 12 and 13, it appears: "To the People of Puerto Rico: a certain tract of land within the Main Military Reservation, San Juan, Puerto Rico, of 46 acres more or less, known as the 'Escambrón Tract,' ", which were admitted without objection.

We transcribe what follows from the memorandum:

"The taxes owed by F. Benítez Rexach, as per paragraphs 1 and 2 of the letter dated November 6, of Mr. Rexach, herein enclosed, correspond to:·

"1.—Taxes on real property in the Escambrón Beach Club, from the year 1933–1934 to 1935–1936, both inclusive, and amount, with additional charges and interest, to $4,962.98. He is also owing for taxes on personalty, for the same years, the amount of $328.99, that is, the total due for property taxes is $5,291.97.

"2.—Taxes for workmen's compensation from the year 1926–27 to 1932–33, both inclusive, amount to $1,773.34.

"3.—Excise taxes due amount approximately to $2,355.95.

"Concerning the former, that is, property taxes on real and personal property, Mr. Benítez Rexach is of the opinion that the Treasurer lacks authority to impose a tax on the buildings, fixtures and furniture of the Escambrón Beach Club, because said buildings, etc., were situated on land of the Federal Government.

".Mr. Benítez Rexach bases his belief on the fact that according to section 291 of the Political Code, the property of the United States and all property exempted from payment by the laws of the United States, would be exempted from taxation, and this is an error because the buildings, furniture and fixtures on land belonging to the United States do not belong to the United States but to Félix Benítez Rexach.

. . . . . . . . . ''

In the letter written by the defendant to the plaintiff it is said:

"Now well, as concerns requesting the opinion of the Attorney General concerning this matter, inasmuch as the Treasurer is a legal expert, it seems appropriate not to request his opinion since the undersigned has no doubt whatsoever, considering the attendant facts and the cases decided as to excises and because the property situated in the Escambrón Beach Club does not belong to the Federal Government, that the taxes were duly levied and consequently are owed by you.

"However, if you have copy of any document tending to show that the real and personal property situated in the Escambrón belongs or will belong in the future to the Federal Government, he will be very pleased to examine said documents, for it is clear that under the provisions of section 291 of our Political Code, the property of the United States, and all property exempted from taxation by the laws of the United States, will be equally exempted from taxation imposed by the People of Puerto Rico, but not that which although located on land of the United States, does not belong to the Federal Government.

"In the meantime please give your best attention to the payment of the taxes in question, and you may pay them under protest if you so desire, or in such form and manner that, being less damaging to your financial interests, it may lead to an understanding without further delay, inasmuch as the undersigned feels inclined to give you all proper opportunities to that effect."

The defendant objected to the admission of a certain letter from Lewis M. Milbourne, Collector of Internal Revenue from Baltimore, Md., on the ground that it was immaterial and because it was not related to the matter in controversy. It was admitted. It is dated July 15, 1935, it is addressed to the Escambrón Beach Club, San Juan, Puerto Rico, and reads:

"The Commissioner of Internal Revenue, Washington, D. C. has directed this office to secure from your club the following detailed information necessary to determine whether or not it would be subject to the Federal Income Tax.

"1.—Complete explanation of the form of organization of the club; i. e., whether it is owned and operated by an individual, by a corporation or otherwise.

"(a) If the club is operated by a corporation, state the date of incorporation, where formed or organized and under what laws. A copy of the articles of incorporation and the by-laws or other form of rules and regulations governing the activities of such corporation should be given.

"2.—Whether income is derived from sources within the United States (exclusive of the income derived from the patronage of the club which is located within the grounds of the Escambrón Military Reservation). Explain in detail.

"(a) Amount of income from such sources.

"You should also furnish copies of the club's financial statements showing assets and liabilities as at the close of each of the years 1934, 1933, 1932 and 1931 and all receipts and disbursements during the same periods."

Witness José Maduro, in charge of leases in the office of the auditor, identified two letters that were admitted in evidence. The first one, dated March 10, 1932, is written by Benítez Rexach to Esteves. It reads:

"In view of the difficulties that have arisen between the military authorities and the Insular Government, which have delayed the construction of the resort in the Escambrón, I take the liberty of bringing this to your attention:

"When we completed the terms of the contract, you will remember that we mutually agreed that the term of the contract would

begin to run one year after the date of the signing of the contract so as not to pay any rental while the construction was in progress, and to begin paying it when the business yielded a profit, and we calculated that it would approximately take one year to complete said construction.

"It happens now that three months have elapsed and Congress has not yet approved the conveyance, and it is possible that many more months may elapse and still I may not be able to start constructing.

"I do not wish to take too much time to explain you this point in detail for I am sure that you will grasp the real situation.

"I entreat you to settle this matter and I suggest you to write me a letter saying that in view of the present statement of affairs, the contract will begin to run one year after the date on which the Federal Government puts the Insular Government in official possession of the land, so that I will pay rent one year after I receive them."

And the second, of March 17, 1933, is from Esteves to Rexach. It reads:

"The petition is granted in accordance with clause 15 which appears in an additional explanatory note attached to the contract, of lease, that is to say, that the date on which the contract shall begin to run will be on the same date that the property is conveyed to the People of Puerto Rico, and you may freely dispose of the land leased, instead of on the date on which the contract was signed, as stated in clause 4."

Also identified by witness Maduro, there were admitted a letter of March 28, 1932, written by the Assistant Auditor to the Treasurer of Puerto Rico authorizing the cancellation of receipts for $46.40 and $600 issued in the name of the plaintiff, and another letter of February 23, 1935, from the Commissioner of the Interior to the Treasurer concerning said receipts and the letters of Benítez Rexach and of Esteves, from which the pertinent part was transcribed.

Witness Armando Morales, Assistant Chief of the Division of Public Lands of the Department of the Interior. He identified the plan introduced in evidence prepared in 1909, which served as a basis for the decree of the President con-

cerning military reservations, including the Escambrón tract. He also identified the decree—General Order No. 97 of July 7, 1903—which includes the Escambrón tract, and which was admitted in evidence. And that concluded the evidence for plaintiff.

The first witness for defendant was Guillermo Esteves, Commissioner of the Interior of Puerto Rico from 1918 to 1932. He testified:

"In or about 1925, the Government of Puerto Rico was interested in exchanging certain Insular realty for Federal land. This land included many parcels of land owned by the Federal Government, which had been reserved by the Government of the United States and that the Government of Puerto Rico was interested in acquiring. About that same year the Legislative Assembly of Puerto Rico approved an Act authorizing the Government of Puerto Rico to effect a series of barters of land and Insular properties for Federal properties. In general, the idea was for the Federal Government to transfer to the Government of Puerto Rico all the Federal lands located on the Eastern side of a line crossing the Capitol in a North-South direction; in exchange therefor, the People of Puerto Rico would give other properties. Among the properties located on the East of this North-South line there was the Escambrón tract, which extends to the East of this line crossing the Capitol on a North-East direction. The steps were taken by virtue of certain correspondence between the Governor of Puerto Rico, the War Department under which Puerto Rico was at that time, and the other departments which had any authority over said parcels, inasmuch as some were under the Department of Commerce, others under the Department of the Navy, and others under the Department of War. At that time, the Insular Government had already begun construction of the Muñoz Rivera Park, and the boundary of the insular parcel of land located in front of the Colectiva, which is at present part of the Muñoz Rivera Park, was located on a line more or less running or occupying the extension of the Muñoz Rivera Road, on the South side. One of those lots, therefore, which the government was interested in acquiring immediately under the general exchange it was attempting to complete, was, hence, the lot known as the Escambrón tract. Upon discussing the exchange of this lot, aside from the general exchange of land to be made, the Department of War required the People of

Puerto Rico to supply it with a shooting range, for it is common knowledge that the army had it shooting range in the Escambrón. By an Act of the Legislature money was appropriated, funds, for the purchase of land, and then the People of Puerto Rico, with the approval of the Department of War, did purchase a parcel of land, known today as 'Camp Buchanan', where the shooting range that the Federal Government had in the Escambrón was installed.

"After the Federal Government was put in possession of 'Camp Buchanan' by deed—deed which was accepted by the Government of the United States—the Government of Puerto Rico entered and took possession of the Escambrón tract, under the authority granted by the Department of War. . . . .''

After plaintiff moved to strike from the record all the above transcribed testimony, the questioning went on thus:

"A.—Tell me, Mr. Esteves, did you, as Commissioner of the Interior, take possession of the lot known as the 'Escambrón tract'?

"W.—I did. I took possession and we constructed thereon.

"A.—You have just testified that the People of Puerto Rico took possession and constructed thereon. What were those constructions?

"W.—The Muñoz Rivera Park, the base-ball park, the roadway that turns along the sea shore. . . . .

"A.—Now, tell me, it took a certain length of time to complete those constructions?

"W.—Of course. They are still under construction. Several years.

"A.—And during that length of time, did you ever have notice to the effect that the Government of the United States objected to said constructions and that it ordered them to stop?

"W.—Up to the year 1932 that I was Commissioner, I never had such notice.

"A.—And do you know whether the Government of the United States had knowledge of the fact that the People of Puerto Rico had occupied that land and were constructing thereon?

"W.—They must have had knowledge of it because there are certain letters, they must be in the Department of the Interior, that make no objection to the construction.

"Plaintiff: I move that it be stricken from the record.

"Judge: Yes, strike out what those letters say.

"Defendant: A.—Showing a document to the witness. It is the copy of a cable.

"W.—A cable from Creed F: Cox, Assistant Chief of the Bureau of Insular affairs of the Department of War, to the Governor of Puerto Rico."

The cable was admitted in evidence without objection. It reads:

"Escambrón Tract comma agreement between War Department and Insular Government in nineteen twenty five and nineteen twenty six contemplated exchange of above tract for new target range without reservation of bathing beach stop Insular Government has carried out agreement at large expense and deeded Camp Buchanan to the United States stop Immediate transfer of Escambrón prevented by a change of the law necessitating reference to Congress stop While the War Department did not realize Insular Government would at once start construction comma it would not be justified in stopping construction now as embarrassment and loss to Insular Government and contractor would result stop Notify the Insular Government that objection to present construction work is withdrawn stop in order to prevent further complicating the matter during its consideration by Congress comma no further construction should be started on the site stop In view of fact that War Department is morally committed to the transfer and as Insular War Department should now show its good faith and permit the Porto Rican Government free use of the Escambrón Tract stop This would require discontinuing bathing by military personnel and fireing by antiaircraft organizations stop."

The witness went on testifying as follows:

"Defendant. A.—Witness, a contract of lease has been herein presented in evidence which was executed by the Commissioner of the Interior and Félix Benítez Rexach on December 18, 1931. Was that contract executed by you in your official capacity?
"W.—Yes, sir.
"A.—Were the terms of that contract discussed by you and Félix Benítez Rexach?
"W.—Yes.
"A.—And tell me, witness, by virtue of that contract . . . who put Benítez Rexach in possession of the land he actually occupies?
"W.—The Department of the Interior.
"A.—Was he put in possession by virtue of that contract?
"W.—Yes, sir, by virtue of that contract.

"A.—And he took possession by virtue of this contract?

"W.—By virtue of this contract.

"A.—Did Benítez Rexach begin constructing during the time he occupied the land?

"W.—Upon signing the contract he immediately began to construct.

"A.—And was it necessary for Benítez Rexach to see any person to secure the approval of said constructions?

"W.—He submitted the plans to the Department of the Interior.

"A.—And were they approved by you?

"W.—Yes, sir.

"A.—Now, tell me, do you know whether during the time that Benítez Rexach has been occupying those lands as lessor he has been disturbed in the possession of said lands?

"W.—Up to 1932, that I have personal knowledge, he was never disturbed.

"A.—And the Federal Government? Do you know whether the Federal Government did at any time object to the construction?

"W.—I do not know of it.

"A.—I mean during the time you were Commissioner.

"W.—I never knew that he was molested."

He identified the memorandum he sent to the Governor of the Island as Commissioner of the Interior, which was admitted in evidence. It reads:

"For some time past, the Governor of Porto Rico had been trying to find some possible way whereby the problem of constructing several important public works, such as a new insane asylum, a modern penitentiary, a new public park, and a public road to serve as a new traffic outlet to San Juan, might be solved.

"Many have been the efforts made to carry out this building program, and as the Insular Government did not possess the necessary sites for the purpose in view, and official correspondence was started with the Federal authorities in order to secure certain lands owned by the Federal Government which were used as Military and Naval reservation, in exchange for various public buildings belonging to the People of Puerto Rico, which on account of their proximity to the Military Post of San Juan, were desired by the Military authorities.

"Seeing that both governments, the Federal and the Insular, were mutually interested in the exchange of these properties to meet

their various needs, General McIntyre, Chief of the Bureau of Insular Affairs recommended in one of his letters, that a study should be made whereby the transfer of these properties might be accomplished. He recommended particularly, that as regarding the construction of 'Muñoz Rivera Park' in Puerta de Tierra, the Insular Government should try to acquire near San Juan a suitable target range and aviation field, and to transfer same to the Federal Government in exchange for the lands known as the 'Escambrón', which might serve to increase the area of said park, extending its north side to the shores of the Atlantic Ocean.

"With these recommendations in mind, representatives of both governments, after several conferences, reached a satisfactory agreement, and a law was passed by the Legislature of Porto Rico, approved by the Governor on June 17, 1925, whereby the Governor of Porto Rico was authorized to purchase and equip a suitable target range and aviation field and to convey the same, with other properties, to the United States, and to accept from the United States certain properties that are no longer needed for the purpose of the United States; to authorize the issue of bonds of the People of Porto Rico in the sum of two hundred thousand (200,000) dollars to carry out such purchase, and for other purposes.

"The bonds authorized by this Law were issued and sold; the target range and aviation field were constructed and transferred to the Military Authorities at San Juan, P. R., who are at the present time in possession of them.

"As by section 2 of the above mentioned Law, the Governor of P. R. is authorized to accept, in the name of the People of Porto Rico, several properties of the United States, among others, the parcel of land known as 'El Escambrón', which is to be added to the 'Muñoz Rivera Park', now under construction, and it being necessary that the Insular Government be given now possession of this land, I respectfully request of you to take up the necessary steps with the Federal Government so that the required transfer might be made.''

Upon cross-examination by plaintiff, he testified:

"Plaintiff. A.—Mr. Esteves (showing him the contract of lease entered into by Mr. Esteves and Mr. Benítez Rexach) how many days after the execution of the contract was clause 15th added?

"W.—The main contract was executed on December 15, 1931, and clause 15 was added on December 18, 1931.

"A.—What gave rise to clause 15?

"W.—This clause was added because as the Government of Puerto Rico, inasmuch as the Federal Government had issued no decree or approved any bill transferring the reservation of the Escambrón to the People of Puerto Rico, it was desirable to leave an open door to any possible claim that Félix Benítez Rexach might desire to file by virtue of constructions made therein. I inserted it to protect the People of Puerto Rico.

"A.—But it is in conflict with the preceding clause, however, where it is said that the People of Puerto Rico is the owner?

"W.— . . . . .

"A.—That was the first modification of the contract. Which was the second? Do you remember?

"W.—The second change in the contract was made by letter; there was no change in the actual contract, but Benítez Rexach, I cannot remember when, sent me a letter explaining when the contract should begin to run; a letter dated March 10, 1931.

"A.—You answered, did you not?

"W.—Yes, sir.

"A.—Did you explain to Benítez Rexach in that letter that Congress alone could convey title?

"W.—It is said in that letter that the United States Congress has passed no legislation approving the conveyance of that land, the request made is granted, that is, that the contract would begin to run on the date that said lands were conveyed to the People of Puerto Rico.

"A.—That is to say, that from that date the People of Puerto Rico have exempted Mr .Benítez Rexach from paying the rental?

"W.— . . . . .

"Judge: Yes, yes, even the Auditor stopped collecting it.

"Defendant: That will be all."

Armando Morales was again called to the stand, this time as witness for defendant. Upon being questioned he testified:

"What part was played by the Federal Government, if any, and if you know of it, in the construction carried on by Félix Benítez. Rexach on the Escambrón tract? .

"W.—According to the existing documents in file concerning the lease by Benítez Rexach, we have a petition from him addressed to the Federal Government asking for permission to install certain pillars and a net to prevent the fishes from entering the small bay

forming the Escambrón beach, and to construct a cement platform. In accordance with the Organic Act, the Federal Government has jurisdiction over all constructions carried on in navigable waters. . . .

"A.—And was that the part played by the Federal Government in this matter?

"W.—Yes, sir.

"A.—And concerning the land. . . . .

"W.—It had no intervention in the matter of the land; the land belongs to the People of Puerto Rico.

"A.—And as to the construction, there was no. . . . .

"W.—No, no. Inasmuch as submerged lands belong to the People of Puerto Rico, they also notify the People of Puerto Rico in case they have to make any objection. . . . ."

Last, the defendant called to the stand the attorney for the plaintiff, Mr. Guerra-Mondragón. He said:

"A.—Tell me, Mr. Guerra, are you the attorney-in-fact of Benítez Rexach?

"W.—For this matter and another one. · · · ·

"A.—Do you know, as such attorney-in-fact, of all the transactions and dealings of Benítez Rexach related to the Escambrón?

"W.—Almost.

"A.—Tell me, do you know whether Benítez Rexach has of late sub-leased the Escambrón?

"W.—Yes, of course. Since the month of June or July; at the end of June.

"A.—And has Benítez Rexach by virtue of said sub-lease received any compensation or remuneration?

"W.—He has not personally. He has assigned the rental. . . . .

"A.—How is that?

"W.—He has not personally, he has assigned the rental to his wife.

"A.—He receives it and has assigned it to his wife.

"W.—She receives it personally.

"A.—But technically it belongs to him?

"W.—To both of them, it is conjugal property.

"Do you know under what authority is Benítez Rexach in possession?

"W.—Under the authority of the contract. And he is in danger that a Congress that understands nothing of these things, of these

matters, will decide merely not to approve the bill, and Benítez Rexach would remain in the air.

"A.—But up to now Congress has not interfered with Benítez Rexach?

"W.—Not at all.

"A.—And the profits of that business, who receives them? Benítez Rexach?

"W.—Now she does.

"A.—What is the rental?

"W.—$24,000 yearly. And I can also tell you it is payable yearly in advance."

Such is, in short, the evidence introduced on September 10, 1936. The first day of the following October the defendand filed its answer on the same terms as the answer that was filed to the restraining order.

Both parties then filed the following stipulation:

"That all the issues of law in this case were raised during the hearing to show cause why the preliminary injunction prayed for by petitioner should not issue, and that were further discussed in the respective briefs that were submitted. The parties state that all the issues of fact that they had and have were also raised on the aforesaid day, and having no further evidence to offer, they stipulate and agree, upon the court's approval, that the decision to be rendered by this Hon. Court in the aforesaid petition for a preliminary injunction should be made extensive, as final decision, to the petition in injunction.

"The parties further admit the existence of an agreement between the Government in Washington and that of Puerto Rico, as it appears from the testimony of witness Guillermo Esteves and from Exhibit A of the defendant, which appear in the record. And last, the parties further admit that steps were taken and are at present being taken by the Department of the Interior of Puerto Rico to secure from Congress and the authorities in Washington a perfect title to the Escambrón tract."

The stipulation was thus approved by the court that decided the case by judgment dated October 19, 1936, in favor of petitioner. And from that judgment the instant appeal was taken by defendant, on the following assignments of error:

"1.—The District Court of San Juan erred in holding that the Escambrón Beach Club is situated on land belonging to the United States of America, and over which it exercises exclusive jurisdiction.

"2.— . . . in deciding that the Government of Puerto Rico has no authority nor can exercise jurisdiction to levy taxes on the buildings of petitioner situated on the land known as the Escambrón tract in the territory of Puerto Rico.

"3.— . . . in deciding and holding that the right on which appellee bases his petition is clear and does not give rise to a controversy of title that can not be decided within this summary proceeding, which question should be argued and decided in a plenary suit.

"4.— . . . in deciding that the relief prayed for by plaintiff does not violate the provisions of the statute that prohibits the issuing of injunctions to prevent the collection of taxes.

"5.— . . . in deciding that under the facts stated in the complaint, the plaintiff was not bound to pay the taxes under protest, there being an adequate and speedy remedy granted by law to protect his rights.

"6.— . . . in deciding and holding that the complaint states facts sufficient to grant the plaintiff the remedy of injunction prayed for.

"7.— . . . in holding that the doctrine of estoppel is not applicable to this case, and in deciding that plaintiff had not come with clean hands."

After a careful study of all the questions involved, we think that the judgment appealed from must be reversed.

██ The facts appear clearly from the pleadings and the evidence, and they appeal so strongly to the conscience of the judge that he must render judgment without hesitation.

The legislator has definitely provided:

"An injunction can not be granted:

. . . . . . . . . .

"7. To prevent the levying or collection of any tax levied by the laws of the United States or of Puerto Rico." Section 678 of the Code of Civil Procedure, 1933 Ed.

And herein we are dealing with the collection of a general tax imposed upon every property by the Puerto Rican statute.

It is true that in spite of the strictness of the legal provision cited, the courts have continued to issue the equitable writ of injunction in certain extraordinary cases. *Miller* v. *Nut Margarine Co.*, 284 U. S. 496; *Durlach Bros., Inc.* v. *Domenech, Treasurer*, 47 P.R.R._____. Can this case be considered one of them? Not in our opinion.

In the first place, if the petitioner believed that he was not bound to pay the tax, he should have complied with the duty imposed upon him taking advantage thereafter of the remedy granted to him by Act No. 8 of 1927 (Session Laws) which provides:

"Section 1.—Whenever a taxpayer believes that he should not pay any tax or part thereof, he shall, however, be obliged to pay the same in full upon request of the collector of internal revenue of his district, or of the official in charge of the collection of taxes, and shall he desire to make any claim, shall ask the said collector or the said official in charge of the collection of taxes, on making payment, to endorse the tax receipt, specifically stating whether the said protest refers to the whole or to a part of the tax paid under protest, and setting forth the exact amount protested. The said endorsement shall be signed by the taxpayer and by the collector or officer in charge of the collection of taxes."

"Section 3.—A taxpayer who shall have paid under protest the whole or part of any tax may, within the term of one year from the date of payment, sue the Treasurer of Porto Rico in an insular court of competent jurisdiction, or in the District Court of the United States for Porto Rico, to secure the return of the amount protested. The Attorney General shall represent the Treasurer of Porto Rico in such suits. Upon the filing of the complaint, if it be filed in an insular court, it shall follow the procedure, conditions and requirements provided by the Code of Civil Procedure in an ordinary action. When the case is ready for trial, the court shall fix the day for the trial thereof, on petition of any of the parties, with preference to any other matter pending before it. When final decision is rendered, if favorable to the taxpayer, the Treasurer of Porto Rico shall proceed to return to him the amount directed in the decision, to be charged against any fund in the Treasury not otherwise appropriated plus interest on such amount at the rate of six (6) per cent per annum, computed from the date of the filing of the com-

plaint in the court or on the petition of the taxpayer, the Treasurer shall credit him with the total amount to be returned, to be applied to the payment of any tax already due and unpaid or to become due in the future; *Provided,* That said credit may be transferred by the taxpayer, and then the Treasurer of Porto Rico shall credit it to the assignees, for all purposes of the law. Costs, expenses and attorney's fees shall be imposed in the discretion of the court in the same manner as in all other civil cases.''

He had, therefore, in hand, an adequate and speedy remedy at law. No irreparable damages were shown to exist. Nor multiplicity of suits. If the suit were not decided within the fiscal year, it would suffice to repeat the payment under protest when the time came and again file suit which would be decided by the decision of the first one. That is not the multiplicity of suits to which the jurisprudence refers.

And in the second instance the alleged right not to pay the tax is at the most a doubtful one, and the facts show the petitioner not as the victim of an error, an illegal act or an abuse of the treasurer, but as a litigant who knows how and can defend himself.

For a sum of $100 per month he leased 10,600 square meters of land in the San Juan islet, near a park, to establish therein a lucrative business for a period of from fifteen to thirty years, with a warranty to the effect that all buildings of a permanent nature there constructed by the lessee would become the property of the lessor only after paying to the former their fair value.

He did not begin to pay rent at once. He had one year free of it under the contract in order to start building, and thereafter took advantage of certain difficulties that arose, more apparent than real, to request the return of what he had paid and he obtained it, and later securing through a very apt letter an answer susceptible to varied constructions, it appears that he went on paying nothing although he admitted through his attorney-in-fact in open court that he had subleased the business for a rental twenty times as large as the one he was bound to pay for the land.

And when the lessor, the People of Puerto Rico, represented by the Commissioner of the Interior, levied and collected through the Treasurer for his interest in the land, the same tax paid by any other landowner of the island, he refused to pay, denying the title of the People who gave him possession, who have kept him in undisturbed possession, and who have permitted him to establish and develop his profitable business. And not only did he take that attitude, but asked for the protection of equity jurisdiction thus overstepping the proceeding established by law for the protection of taxpayers who believe that an illegal tax is being exacted from them.

There is no doubt that the land on which the properties in question are situated form part of the Federal Reservation, but it is also doubtless that the People of Puerto Rico obtained title and possession to them by virtue of a contract of barter entered into with the Federal authorities, pending solely on the date of the contract the perfection of the title which was finally done by a Federal Act approved on April 26, 1938, 75th Congress, 3rd Sess. Ch. 176, 52 Stat. 247.

And this being the true state of facts when the contract was entered into, during all the time that the plaintiff enjoyed, as he is still enjoying, all the rights granted under the contract, wholly undisturbed, it is now unnecessary even to consider the cases cited which hold that the Island could not levy a tax on property located on Federal Reservations, especially when we are not considering the case to definitely decide it, but merely to hold that it is not so clear and extraordinary as to justify the issuance of an injunction.

For the reasons above stated, and for others that could be easily set forth, the judgment appealed from must be reversed and another one rendered dismissing the petition, with costs.

Mr. Justice De Jesús took no part in the decision of this case.